Good morning, Illinois Appellate Court, 1st District Court is now in session, the 4th Division, the Honorable Robert E. Gordon presiding, case number 1-9-0-8-2-6, People v. Marquise Alexander. Good morning to everyone. With the lawyers who are going to argue the case, please introduce yourself to the court. Good morning, Your Honor. I'm Erin Mahoney on behalf of the Defendant Appellant Marquise Alexander. Good morning, Your Honor. Counsel Paul Wysicki on behalf of the people of the state of Illinois. As to the appellant, are you going to reserve some time for rebuttal? Sure, Your Honor. Three minutes. Okay. All right. Well, let's proceed. Thank you, Your Honor. Your Honors, on the surface, I know this case looks all too familiar. We have a young black male in a high-crime neighborhood in Chicago who's convicted by a jury of possessing a firearm. But on closer examination, the facts and the evidence in this case are markedly different from the typical weapons possession case this court normally sees. The state has not identified a single case that comes close to the evidence in the case here. Either an outright reversal is warranted based on the insufficiency of the evidence supporting Mr. Alexander's conviction, or based on the ineffective assistance of Mr. Alexander's counsel. On the insufficiency of the evidence issue, I recognize that Mr. Alexander has an uphill battle here. But while the jury's decisions and their findings are afforded deference, they are not conclusive. This is one of those cases where the jury got it wrong. The state's entire theory of the case, not simply one aspect of it, but the entire theory of the case, rests on conclusions and inferences that are simply too improbable and contrary to human experience to be accepted. From how Mr. Alexander supposedly threw the gun onto this narrow ledge directly in front of the officers, to the gun landing on the ledge, to the officer's reaction when they observed this, to Mr. Alexander's reaction when he miraculously is allowed to walk away. Everything that supposedly happened in this case is completely contrary to what we would expect would happen. First, as to the gun getting from Mr. Alexander to the ledge, the officers are supposedly only six feet away from him when this happens. And because we've all been social distancing, we have a sense of how far six feet really is. It's not that far. It's pretty close. Officer Conroy has a flashlight directly on Mr. Alexander, but what does he see? He doesn't see any bulge in the clothing, although Mr. Alexander's wearing skinny pants and a tight jacket. He doesn't observe any reaching for a waistband, any fishing around in pockets. He's not observing or holding any object other than his cell phone. They don't see him tossing anything. They don't see any jerking movements with his body. It's not recovered on the ground where Mr. Alexander is standing. It's not on the stairs next to him. It's not on the platform at the bottom of the stairs. But it somehow manages to travel across the stairs, across the platform, onto a narrow ledge that has a pile of junk behind it. And even though it's very dark, it's very dark in the area of the house. And there's this pile of junk. The officers hear only a single thud. The gun didn't hit anything else. It didn't ricochet off the junk. It didn't drop down to the platform. It landed perfectly on the ledge without bouncing on anything else. So the state's theory of how Mr. Alexander supposedly got the gun onto this narrow ledge is highly improbable and very nearly physically impossible. When they observe this, what do they do? They don't activate their body cameras despite just believing, according to their testimony, that Mr. Alexander had thrown a weapon directly in front of them. And they make no attempt to detain him. They tried to excuse this failure by suggesting they believed Officer Turner predicts this testimony. It's the officer's body camera footage. On that footage, the officers make no reference to Officer Turner when they discuss who should go grab Mr. Alexander now that they've discovered the weapon. Then we have Mr. Alexander. What does he do? Well, first, the state's theory requires you to accept that Mr. Alexander is standing six feet away from the officers with a flashlight on him. And he decides his best course of action is to take a risk and pull a gun out of his clothes and attempt to throw it in the backyard. Not only does he do that, but then once he's allowed to leave, somehow he's just thrown this gun in plain view of the officers. They let him walk away. He knows they're headed to the backyard where this gun is going to be in plain view. They've got flashlights. They're looking for something. What does he do? He doesn't run and get out of there as fast as he can, having miraculously gotten away with this. He's walking kind of slowly down the block. So this is simply not a case where the jury was entitled to credit the officer's version of events as opposed to Mr. Alexander's version of events. The officer's testimony and the state's theory of what happened in this case from beginning to end is simply too improbable and contrary to human experience to be accepted. From the limited circumstantial evidence... I have a question, Counsel. I have a question. What was the distance from where he was standing where the defendant was standing to where the ledge was located? What was the exact distance there? There isn't an exact distance given, Your Honor. It was estimated to be about four to five feet, I believe. There's four to five stairs going down. So arguably the distance is even farther than that because you have the stairs plus the platform at the bottom of the stairs. So when he allegedly threw the gun, was he still holding his cell phone or had he already put his cell phone away? The officer testified he was holding his cell phone at this time. Okay. And during the testimony, was there ever established what his dominant hand was? Was he right-handed? Was he left-handed? That was not discussed during the testimony, Your Honor. Okay. So from the limited circumstantial evidence linking Mr. Alexander to the recovered gun, any conclusion that he threw the gun onto the ledge is based on nothing more than conjecture and speculation, not reasonable inferences tending to establish his guilt. For this reason, outright reversal is warranted. Then on the ineffective assistance of counsel issue, Officer DePlessin's statement, look what I found right where you were standing was the functional equivalent of interrogation under Rhode Island v. Innis. The statement has to be viewed in the context of which it was made. Mr. Alexander's in handcuffs. He's been told he's being arrested. In response to that situation, he asks, can I ask why I'm going in? What did I do wrong? Officer DePlessin then shows him the gun and says, look what I found right where you were standing. In that context, the statement posits Mr. Alexander's guilt of a crime and accuses him of illegally possessing a firearm. That accusation, when an officer accuses an individual of being guilty of a crime, that accusation is reasonably likely to elicit some kind of incriminating response related to the crime, whether a denial or admission or an explanation. Nor is Officer DePlessin's statement excused here because it was in response to a question or because it was informational. In Olivera, the Illinois Supreme Court rejected that rationale. The court said that a statement can still be likely to reason reasonably likely to elicit an incriminating statement, even if it's in response to a defendant's question. There, the defendant asked what happened in what happened during a line and the detective responded that you were identified, which was in response to a question and is also informational, ultimately was the functional equivalent of an interrogation. The same rationale applies. The state relies on Ross, but that case is distinguishable, and it was arguably decided under an incorrect standard that conflicts with Rhode Island versus Ennis and Olivera. In Ross, the defendant was in custody when the officer told him, I know why you were running. Unlike Officer DePlessin's statement here, the statement in Ross did not posit defendant's guilt of a crime. Additionally, the standard the court applied there does potentially conflict with Rhode Island versus Ennis and Olivera. In its reasoning, the court in Ross said the officer, quote, did not ask defendant any questions and did not seek or require a response from defendant. But the whole point of Ennis is that there does not need to be a question. If there's not a question, then we apply the Ennis inquiry. That's the beginning of the inquiry. If there's not a question. And then similarly, the statement does not need to actually seek or require a response. Standard is, is it reasonably likely to elicit an incriminating response? So for these reasons, Ross is distinguishable on its facts and arguably applied an incorrect standard that conflicts with both Rhode Island versus Ennis and Olivera. As to prejudice, the prejudicial impact of the admission of that statement is easily demonstrated by the prosecutor's reliance on that statement during closing arguments. To argue that it showed Mr. Alexander knew exactly where the gun was recovered. And it's also shown by the state's extensive reliance here on appeal on that statement to support the sufficiency of the evidence. And then I just wanted to make one final point, Your Honors, about the state's argument that the look of surprise on Mr. Alexander's face supports the conviction. This is a type of argument that has exceeded its shelf life and it should be rejected. And courts are starting to do that. In U.S. versus Weaver cited at page three of the defendant's reply brief, the government had tried to rely on the defendant staring at police officers as reasonable suspicion for a Terry stop. The Second Circuit majority in that opinion rejected the argument that the defendant staring at the officer show that the defendant was attempting to avoid police surveillance. The court further recognized that even if the defendant had been quote concerned about encounters with the police. The hard reality is that in light of incidences of police brutality and discriminatory policing minority citizens across the country fear encounters with police, whether guilty or innocent. Here the state needs to be held to its burden of proof and should not be allowed to rely on entirely speculative evidence, such as a young black male's facial expression when he encounters police officers to salvage a conviction that is otherwise unsupported. For these reasons, we ask that this court either reverse the conviction outright or alternatively for man to or man for a new trial. Thank you, Your Honors. Any questions. Regarding the statement. So, you know, he never, he never makes an admission. He never says anything in terms of specific facts about the weapon or where it was located. There was really no response to what you could say, you know, it was tying them into the, to the weapon. So then it's all just by by inference, which is what something would councils would argue during during the trial. So, um, how does the statement here really impact the jury's decision. Certainly, I agree with you that I don't believe that the statement does suggest that he knew where the gun was found, but the prosecutor argued that statement explicitly in his closing argument and said that the statement Mr. Alexander made show that he knew where the gun was recovered and the state has expressly and explicitly relied on that statement here to show that it was highly incriminatory and showed his knowledge of the gun. So, based on those, I would argue that it was prejudicial. Okay, let's hear from the state. Thank you, Your Honor may please the court counsel. This case is about sufficiency of the evidence in the first instance and one of the important things we need to remember is, of course, the applicable standard of review. The evidence has to be viewed in a light most favorable to the state and most favorable to the verdict. And the question ultimately becomes not whether there are other interpretations of the evidence that would be more favorable to the defendant, but whether any rational jury could find this defendant guilty on the evidence presented at trial. And the evidence was more than sufficient to support the jury's verdict. In this case, you do have a defendant who reacts in a way, a furtive way when he sees police trying to avoid turning away from them. It is a reasonable inference to be drawn that the defendant wanted to avoid an encounter with police because he was in fact carrying a weapon. That wasn't the linchpin of this case. And this case doesn't turn on whether defendant was afraid of the police or was avoiding the police. What it turns on are those moments in the gangway when police observed and heard the defendant essentially discard a weapon. Remember what happened here as the police proceeded down the gangway they illuminated their flashlights, they were behind the defendant so they couldn't see whether he had a gun tossed in the front of his waistband or what he was doing with his hands in front of his body. When he got to the edge of the building was at that point that he looked behind him saw the officers, maybe looked over his right shoulder. He then stopped at the edge of the building and lean in a way. Well, he pulled his cell phone out with his left hand then he leaned to his right. His body was covered by the building it could not be observed. So, it was at that point obviously that he removed the gun from wherever he was carrying it, and tossed it down that stairwell, it happened to land on a ledge that no one saying that you know this was someone was pitching pennies here and there was trying to put it As the police observed the defendant lean out of their sight at that very same time is when they heard what was to them a very familiar sign of metal hitting concrete a gun hitting concrete. They then allowed the defendant to pass as he came back toward them but only after frisking him, and then probably went into the backyard to secure area because they did not want to be ambushed guns don't fire themselves. They had to see was there anyone back there. Was there anyone armed to the defendant toss the gun to someone else. Was this person that they were originally looking for back there. So to say that their actions were somehow contrary to human experience or somehow irrational doesn't comport with the facts, it was a reaction that was quite rational to avoid being ambushed and shot and shot and killed in search of someone with a weapon and responding to a report of a man with a gun. And this all happened they went into that backyard immediately after they saw the defendant discard the weapon. They passed into the backyard, the first the lead officer officer Conroy, his job was to make sure no one else was there. He was followed seconds later by officer Dupulton, who also looked around and then observed the firearm a loaded nine meter on the ledge of the stairway, and I, you know, the stairway ran right along the back of the building we've all seen homes like this in Chicago. There's no lane, there's no obstruction. You just, there's just the stairway, and it kind of like stairs down to a baseball dugout. It's an open area there's the ledge there the concrete ledge and that's where the gun landed again the key is, we're not talking about a gun that was found 30 seconds or 30 minutes or 10 minutes, an hour after the defendant was observed discarding it. We're talking about a gun found within a few seconds after the defendant is seen leaning, hiding behind hiding half his body behind the building and tossing this gun where the to permit a rational jury to conclude that Mr. Alexander did in fact possess a firearm as an armed habitual criminal remember they they stipulated that there were two qualifying offenses here that this defendant had against him to qualifying convictions. So the only issue was possession and that possession, whether you call it constructive or actual was amply supported by the evidence in this case, his statements were, if you will, they were there in addition to but they were not fundamental to the evidence to require conviction. He didn't blurt out and say yes I had a gun. So even if you didn't have those statements, the result in this case there's no probability that the result in this case would have been any different. And what do we know about statements when we get to the ineffective assistance of counsel argument. The defendant has to show a couple of things first he has to show that the motion would have been meritorious. Then he also has to show that there was prejudice. And even before that he has to show that, you know, this being a motion to suppress it falls within trial strategy and a trial strategy decision under Strickland under a Strickland challenge is virtually untouchable. But even so when we look at the situation here. It is not reasonably likely or the motion would not have been meritorious even had it been filed. Why because this was not an interrogation. It was information provided in response to defendants question. It was not. There's nothing about the circumstances that indicate that it was made the statement was made in in reasonable anticipation of a response were in an attempt to engender response. Remember the case that defendants are I believe it's Burson Burton. There, the police officer made a statement the fact hey Jerry you know you know better than to be driving that car. That is the kind of statement that imputes guilt to the defendant, and is trying to make the defendant feel guilty about what he has done. That is a kind of statement is trying to elicit a response yeah yes officer I know I shouldn't have done that. That's not the situation we had here. Defendants said why are you handcuffing me and the officer held up the gun and said, Well, look what we found right where you were standing. And, and it was found right where he was standing right four to five feet away so it's, it's not like it. The gun was thrown a great distance where it would have clattered and banged around on the ground. It was found right where he was right near where he was standing, which was at the edge of the building leaning partially behind the building. So it was not by any stretch, I think, what would be considered a, an interrogation type statement or statement and lit elicited or that sought to elicit rather a response from this defendant. So when we look at the totality of the circumstances in this case, we look at the issues in the case, when we view the evidence as we must in a light most favorable to the state. The facts here amply support the jury's finding that defendant was an armed habitual criminal. When we look at the ineffective assistance of counsel issue. The record amply supports that both the motion would not have been meritorious, and that even if it had been meritorious, the, the result, there's no, no reasonable probability that the result would have been any different, because the statement about. I didn't go back there. Was not the linchpin of the evidence against this defendant, the linchpin was the evidence during those moments as he's leaning hearing that sound of the gun hitting the concrete, and then the police coming upon the wreck upon the weapon. mere seconds after that. All of that happens to close temporal proximity between hearing the sound, seeing the defendant discard the weapon hearing the sound of the weapon hit the ground and discovering the weapon strongly strongly supports the jury's verdict in this case, and essentially indicates that or demonstrates that there's no reasonable probability that even without the statement. I didn't go back there. The result would have been any different. Accordingly, we asked the court to affirm defendants convictions. Is there any questions, Justice Lampkin. No. I just have a question with regards to the, to the weapon itself. My understanding from from looking at the record there wasn't any testimony from any of the officers beforehand, when they were in the hallway that they noticed that the gentleman was was carrying a weapon correct. That is correct. Remember they were they were behind him. Right. Okay, well also when they observed and walking down the street. None of the officers indicated that they observed a bulge or anything of that nature, correct. That's true as they drove down the street there were cars parked along the side so they did see defendant as companion. But they no one indicated that at that point they saw defendant handling a weapon or possession of a weapon. All right, so, so we don't have any evidence of actual possession. Correct. We don't have what we don't have evidence, we didn't have anyone testify that they saw the gun and defendants hand. Okay, and the constructive evidence here with regards to possession is the fact that they heard the gun at the ledge. Well, I think it goes beyond that. And again, and it's the timing. Right. Well, first of all, I think the evidence is sufficient to establish actual possession because of because of the timing factors defendant was seen discarding the weapon and that is that actual possession constructive possession is shown by the, the timing that all of the events occur, you have the officers, six to eight feet away from the defendant. When they see him lean partially behind the building, as he's leaning with his left foot up that, then they hear this very familiar sound of a metal of metal hitting concrete of a gun hitting concrete and seconds there seconds later, they find that gun on the house they didn't encounter anyone in the backyard. When they went to secure the area. And so that is a very strong constructive possession case, strong constructive possession evidence. Right. For the questions. Okay, let's hear the rebuttal. Thank you, Your Honor. Very briefly, this, the state appears to have heard of the gun happening again. And so it comes down to the noise and the lane. And that just is not enough in this case there's no holding of an object there's no grabbing of a waistband there's no flight here, there's nothing really linking Mr Alexander to the gun. We know that it's not his house he doesn't own this house there's somebody else inside the house who could have thrown the gun around the same time. There's also somebody in the neighborhood that the officers were on that block looking for who reportedly had a gun, who could have left the gun there as well. So, with the noise in the lean alone, and the noise of being very suspect giving the officers letting Mr Alexander walk away. That is insufficient evidence to support this conviction and we asked for a reversal. Thank you. Thank you guys for some good arguments and a very interesting case and shortly you'll have a decision in this case. Thank you again for your expertise and what you've done in this case. Thank you. We will have the court adjourned till the next hearing.